# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MACY'S INC. & BLOOMINGDALE'S, INC., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> JOHNSON CONTROLS WORLD SERVICES, ) <br> INC., ) <br> ) <br> Defendant. ) | Case No. 04 C 0879 <br><br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION & ORDER

This matter involves a flood that occurred on March 11, 2003, at Plaintiff Bloomingdale's department store ("the store") located at 900 North Michigan Avenue in Chicago, which occurred while the store was undergoing remodeling. Defendants in this action were originally M.J. Clark, Inc., Global Fire Protection Company ("Global Fire"), and Johnson Controls World Services, Inc. ("Johnson Controls"). A bench trial was held on May 5, 6, 8, and 9, 2008, and concluded on October 28, 2008. Prior to the bench trial, M.J. Clark settled with Bloomingdale's. After the first four days of the bench trial, Global Fire settled with Bloomingdale's.

Bloomingdale's and the remaining defendant, Johnson Controls, have asked this court to proceed in a one- or two-step process. The court is to first determine whether Johnson Controls is liable to Bloomingdale's. If so, the court will then determine the amount of damages owed by Johnson Controls to Bloomingdale's. The following opinion represents the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure as to liability.[1]

---

[1] To the extent that any findings of fact may be considered conclusions of law, and any conclusions of law may be considered findings of fact, they shall be so considered.

## I. FINDINGS OF FACT

### A. Background Facts

The Bloomingdale's[2] store occupies parts of the first six floors of a building located at 900 North Michigan Avenue ("the building"), which is a sixty-seven story building, the first six of which are dedicated to retail purposes. Johnson Controls was under contract with the owners of the building to provide certain engineering and maintenance services for the building. This included, *inter alia*, performing "drain downs" of sprinkler systems when such drain downs were properly requested by the building tenants, or by the building tenants' agents.

Starting in 2003, Bloomingdale's entered into a contract with M.J. Clark to have remodeling performed on the store's fifth and sixth floors. M.J. Clark then entered into an agreement with Global Fire, whereby Global Fire would perform certain sprinkler fitting work related to the remodeling. Chris O'Brien was M.J. Clark's site superintendent at the store in March, 2003, and M.J. Clark is owned and managed by Michael J. Clark, who was also present at the store. During this same period, Global Fire employed Roman Nowak and Michael Peck as sprinkler fitters.

To be effective, sprinkler systems are generally filled with water, under pressure, so that if the system is opened the water will come out quickly. Such systems are generally connected to a pump that will continue providing water in the case that a sprinkler system is activated. Generally, a multi-story building like the building at issue has many independent sprinkler systems throughout the building; in the store the fifth floor had one sprinkler system, and the sixth floor had multiple sprinkler systems.

---

[2] For purposes of this order, "Bloomingdale's" refers not only to Bloomingdale's, Inc., but also to Macy's, Inc., and to other agents acting on behalf of Bloomingdale's or Macy's.

A "drain down" is a process by which the water from a sprinkler system is drained, so that a sprinkler system can be modified without resulting in a discharge of water. Drain downs are not complicated. To achieve a drain down, two valves must be turned. The first valve disconnects the sprinkler system from the source of the water and the pump, so that no new water can enter the system. The second valve leads to a drain, so that the water that is in the system can exit through the drain. To achieve a drain down, the first valve must be closed, and the second valve must be opened.

Johnson Controls is the only entity that is authorized to perform drain downs in the building. Johnson Controls has procedures it is to follow regarding drain down requests. These procedures include, *inter alia*, (1) that the request be made in writing; (2) that a fee be collected from the requestor at the time of service; (3) that the requestor be notified when the drain down is complete; and (4) that the requestor be given a radio that can be used to communicate with Johnson Controls. These procedures have not always been followed when tenants request drain downs.

The remodeling work required sprinkler systems on the fifth and sixth floors to be drained down at various times, either because the sprinkler systems were being changed, or as a preventative measure to ensure that other construction occurring on the floors would not result in an accident that would open a charged sprinkler system.

Prior to Friday, March 7, 2003, M.J. Clark submitted a written drain down request to Johnson Controls, requesting that the sixth floor be drained down. Clark understood that the sixth floor system would remain drained down for approximately two months until the remodeling was complete, but later that day Johnson Controls informed M.J. Clark that the sixth floor could remain drained down over weekends only if M.J. Clark provided "fire watchers"—people to monitor for

3

fires. M.J. Clark was not prepared to do this, so the sixth floor system was recharged on March 7, 2003.

On Monday, March 10, 2003, M.J. Clark held a planning meeting to coordinate upcoming work. Michael Clark, O'Brien, and Brian Windt, a representative from Global Fire, attended. No one from Johnson Controls was present, nor invited. It was agreed that on March 11, Global Fire would work on the fifth floor sprinkler system, dismantling part of the system, and "capping off" part of the system, that is, inserting a block so that the section before that blockage point could remain charged and active, while the section after the blockage point could be dismantled and reconfigured. After this meeting, O'Brien and Windt went to Johnson Controls' office to request a drain down, but were unable to do so because the person with whom they intended to speak was not present. O'Brien returned to Johnson Controls' office later to request a drain down, but did so without Windt. O'Brien met with Joseph Guido and Greg Drantz, representatives of Johnson Controls. What was said during that meeting has become the central dispute in this case, and is described in greater detail below. For now, it is sufficient to state that O'Brien testified that he asked for the fifth and sixth floors to be drained down, but Guido and Drantz testify that O'Brien requested only the sixth floor to be drained down.

The request made by O'Brien was to have the drain down completed by or around 7:00 a.m. Guido and Drantz do not work during the night, and did not perform the drain down. Instead, they communicated the drain down request to a night-shift engineer, Jim Fergus. Fergus drained down the sixth floor at around 5:41 a.m. on March 11. The drain down required twenty to thirty minutes to complete. Fergus did not drain down the fifth floor.

On March 11, 2003, at around 6:00 a.m., Nowak and Peck arrived at Bloomingdale's to perform work on the sprinkler system on the fifth floor. Peck, the more experienced of the two, left

4

the area before Nowak began his work. Peck and Nowak briefly met O'Brien outside of the store, and they then walked through the fifth floor work area, and discussed the work that would occur. Prior to Nowak beginning his work, he went to O'Brien's office, and O'Brien called Johnson Controls to confirm that a drain down had occurred. O'Brien does not know with whom he spoke. The Johnson Controls agent confirmed that a drain down had occurred, but neither O'Brien nor the Johnson Controls agent discussed the specific system or systems that were drained down.

Nowak returned to the work area and began to work on the sprinkler system without personally verifying that the system had been drained. Edward Badgley, a sprinkler fitter and inspector since 1965, testified that Nowak "completely breached the standard of care of a sprinkler fitter" by failing to check if the system was pressurized by, for example, tapping on the pipe, or checking an auxiliary valve that was a few feet away from where Nowak was working. (Tr. 226:6–7, 13–19). The system was still filled with pressurized water, and when Nowak began to disassemble the system, pressurized water began spraying out, and the force was such that Nowak could not re-close the system. The system emitted water, under pressure, for about ten minutes before a Bloomingdale's employee closed the valve to the fifth floor's sprinkler system and opened the drain valve. It is unknown precisely how much water was emitted from the system, but the volume of water was significant, and substantial damage to Bloomingdale's property resulted.

**B.    Testimony at Trial**

    1.    <u>O'Brien</u>

O'Brien testified as follows. During the March 10 meeting, between Clark and Global Fire, it was clear that Global Fire would work on the fifth floor, and only on the fifth floor. He understood that a drain down would be required, and he went to the Johnson Controls office to ask for this. He testifies that he intended to request to have both the fifth and sixth floors drained down.

5

(Tr. 409:13–15.) No one was present, so he returned later and met with Guido and Drantz. O'Brien sat down with Guido, told Guido about the work that was planned for March 11, and asked a number of times to have the fifth and sixth floors drained down. (Tr. 410:16–19.) O'Brien also asked for blueprints of both floors, and they went to a separate room to retrieve them. O'Brien was never asked to fill out a drain down form, or to pay the fee for the performance of a drain down. O'Brien testified that Guido agreed to drain down the fifth and sixth floors.

    2.    <u>Guido</u>

Guido testified as follows. During the relevant time period, Guido was a chief engineer with Johnson Controls. He met with O'Brien in the Johnson Controls offices, and Drantz was also present for part of the meeting. According to Guido, Drantz did not speak during the meeting.

O'Brien asked for blueprints of both the fifth and sixth floors, and they discussed why O'Brien needed the blueprints—Guido understood that they needed the prints to do work on the fifth floor, to determine how to split up the fifth floor's system. While discussing the blueprints, they did not discuss the sixth floor at all.

O'Brien requested a drain down while in the Johnson Controls offices. Guido explained that a drain down request form had to be completed—the form did not have to be received by Johnson Controls prior to the drain down, but had to be received prior to any work being performed on the sprinkler system by M.J. Clark or Global Fire. Guido asked O'Brien to complete the form immediately, but O'Brien did not do so. O'Brien appeared to be "rushed" and in a hurry, and he promised to give a completed form to Guido in the morning. The drain down request form asks nine

6

simple questions, and would not take any significant amount of time to complete.[3] The entire meeting between O'Brien and Guido lasted approximately fifteen minutes.

Guido testified that O'Brien orally requested to have the sixth floor drained down. Guido asked O'Brien two more times if he wanted the sixth floor drained down. Each time, O'Brien said "yes, sixth floor." (Tr. 507:21.) Guido explained that he asked O'Brien two more times because he appeared to be "in a hurry," and because he asked for prints from both floors. (Tr. 508:9–12.) Guido then testified that he asked O'Brien a fourth time, this time asking, "Sixth floor, not the fifth?", to which O'Brien responded, "No. Sixth floor, not the fifth." (Tr. 508:13–15.) Guido testified that "when I asked him the third time and he said sixth floor, not the fifth, he explained to me why, why they weren't working on the fifth floor on the 11th." (Tr. 508:16–18.) These three or four questions were asked within two minutes. O'Brien asked to have the drain down occur early in the morning, prior to 7:00 a.m.

After O'Brien left the office, Guido wrote down the request to drain the sixth floor on a dry-erase board used by Johnson Controls to leave messages between shifts. Guido does not recall exactly what he wrote, but says that he wrote a message to signify draining down the Bloomingdale's sixth floor, and that he is sure that he wrote the word "Bloomingdale's" on the board. He wrote this down right after he met with O'Brien.

Guido was not in the building during the actual drain down, nor during the flooding that occurred on March 11.

---

[3] The form asks for (1) Name of Space; (2) Space Number; (3) Company/Person Requesting Drain Down; (4) Reason for Drain Down; (5) Date and Time of Drain Down; (6) Estimated Down Time; (7) Person Responsible for Space while Sprinkler Coverage is Impaired; (8) Person Responsible to Contact JCI and Observe Sprinkler System Being Put Back Into Service; (9) Person and Phone Number to Contact if a Problem Should Occur.

3. Drantz

Gregory Drantz testified as follows: Drantz was an engineer employed with Johnson Controls in the relevant time period, and was present for much of the meeting between O'Brien and Guido. Drantz testifies that O'Brien asked for the blueprints, and explained that at some point work on the fifth floor would need to be done. On that day, O'Brien asked to have the sixth floor drained down. Guido repeated this back to O'Brien three times, and Drantz also asked O'Brien one time if he wanted the sixth floor drained down. However, Guido never asked O'Brien if he wanted the fifth floor drained down. (Tr. 554:13–16.)

Drantz states that O'Brien made only an oral request, that O'Brien did not fill out any paperwork, and that he was not asked to do so. (Tr. 543:18–20.) O'Brien was "in a rush," and after he left, Guido wrote on the board something to the effect of "drain down sixth floor west on the 11th." (Tr. 544:25, 545:7–15.)

## II. CONCLUSIONS OF LAW

In negligence actions, the plaintiff bears the burden of establishing that the defendant owed it a duty, that there was a breach of said duty, that the plaintiff was injured, and that the defendant's breach was the proximate cause of said injury. *Leonardi v. Loyola Univ. of Chi.*, 658 N.E.2d 450, 455 (Ill. 1995). All elements except for that of injury are in dispute.

**A.    Duty & Breach of Duty**

The issue of whether Johnson Controls owed a duty to Bloomingdale's to drain down the fifth floor is the most complicated, and both parties agree that if such a duty exists, then it necessarily follows that Johnson Controls breached that duty. The question of duty turns on the events that transpired between O'Brien and Guido and Drantz.

8

Both O'Brien's testimony and Guido's and Drantz's testimony suffer from peculiarities that diminish their credibility. For O'Brien, the most credible reading of his testimony requires consideration of the entire sequence of events on March 10 and March 11, which casts serious doubt on how he could possibly have requested the wrong floor while meeting with Guido and Drantz. O'Brien first had a meeting with M.J. Clark and Global Fire employees on March 10, where it was determined that the sprinkler fitters would work on the fifth floor *only* on March 11. He then speaks with Guido and Drantz—albeit later in the day—and both parties agree that he explains to them the general plan for work going forward. He and Guido then discuss multiple times which floor will be drained down. He leaves, and early the next morning he and the Global Fire crew go to the floor and discuss the work to be performed—on the fifth floor. In this sequence it is very difficult to imagine how he could have spoken mistakenly, three or four times, as to which floor needed to be drained down, especially since it is agreed that he explained to Guido and Drantz the general work plan that was being implemented.

However, O'Brien's testimony poses quandaries. The first is his lack of explanation for why he requested to have two floors drained down, even though sprinkler fitting work was being performed only on the fifth floor on March 11. O'Brien does not address this, though Michael Clark suggests that demolition and sprinkler work would be continuing on the sixth floor later that week; indeed, on March 7, Clark had attempted to have the sixth floor drained down for a continuous two month period.

Johnson Controls points to other inconsistencies, though they are more peripheral. First, it points to testimony by Peck and Nowak, who testify that O'Brien told them shortly after the flood that Johnson Controls had drained down "the wrong floor," implying that only one floor had been requested. O'Brien denies making this statement. This inconsistency, even if true, is overstated.

9

The alleged statement could imply that only one floor was requested, but it could just as easily imply what actually happened—that the fifth floor, where the work was being performed, had not been drained down. It is not a significant inconsistency.

Johnson Controls next points to contradictions between O'Brien and Nowak over when, precisely, O'Brien called Johnson Controls to confirm the drain down was completed. Nowak claims that he was first told by O'Brien that the drain down was complete at about 6:00 a.m., when Nowak first arrived at the building, and was outside of the store waiting to be admitted. Indeed, O'Brien contradicts this statement, testifying that he told Nowak that the system had been drained down when they were both in O'Brien's office and he called Johnson Controls. This inconsistency undercuts Nowak's credibility, not O'Brien's. Fergus, who performed the drain down, states that he did so at approximately 5:41 a.m., and that it takes between twenty to thirty minutes to complete. O'Brien had to go down from his office to meet Nowak and Peck outside of the store. It would not have been possible for him to confirm the drain down prior to his seeing Nowak at 6:00 a.m., because it had not have been completed by then.

Johnson Controls next points to testimony by Nowak that he had been told by O'Brien that Nowak would not be permitted to check the valves on the fifth floor to confirm the drain down because, according to O'Brien, Johnson Controls was too busy to show him the valves. O'Brien denies making this statement, and Johnson Controls representatives deny telling O'Brien that they were unwilling to show a contractor the valves. This statement by Nowak was a self-serving statement, attempting to explain his failure to confirm the drain down before beginning his own work, which undercuts its reliability. In any event, this contradiction bears little relevancy to the issue of what was said between O'Brien and Guido and Drantz.

Johnson Controls points to a possible contradiction between Clark and O'Brien regarding whether the sixth floor was mentioned during their March 10 planning meeting. Again, this alleged inconsistency is overstated. Both testified that Global Fire would be working only on the fifth floor on March 11, and neither suggested that the sixth floor was discussed in any great detail. O'Brien stated that the sixth floor was not discussed at all, while Clark was more equivocal, but neither directly contradicted the other.

Johnson Controls next points to a possible contradiction between Clark and O'Brien regarding whether Nowak was present in O'Brien's office when O'Brien called Johnson Controls to confirm the drain down. Nowak and O'Brien both testified that they were together in O'Brien's office when the call was made. Clark testifies that he was told by O'Brien that Nowak was not present. Again, this is not an important error—there is no dispute that O'Brien called Johnson Controls, and Clark's recollection of what he was told about an event is less credible than is the testimony of O'Brien and Nowak, who would know first-hand if Nowak was present when the phone call was made.

Johnson Controls then points to a statement signed by O'Brien on April 22, 2003 (and also signed by Global Fire agents) which suggests that Global Fire had planned to "cap off the system on the 5th and 6th floors" on Friday, March 7, and again on March 11 when the March 7 work did not occur. This document technically contradicts what actually happened. According to the testimony, there was never a plan to work on both floors on either March 7 or March 11. But there was a plan to work on the sixth floor on March 7, the fifth floor on March 11, and to return to the incomplete sixth floor work at a later time. Again, this somewhat undermines O'Brien's testimony, but not significantly so.

Finally, Johnson Controls points to cross examination testimony where O'Brien first suggested that doors to the emergency hallway (where the drain down valves are located) are locked, then suggested the doors are not locked but had an emergency bar, and then admitted that he was not really sure. The relevancy of this cross examination is minimal—O'Brien corrected his own testimony, and there is no reason O'Brien should have known this answer for certain.

In sum, O'Brien's testimony was contradicted in several respects but these contradictions were minor and largely unrelated to the primary issue at hand—what was communicated between O'Brien and Guido and Drantz.

The testimony of Guido and Drantz must also be considered. Again, several peculiarities arise. Guido asserts that he told O'Brien he had to fill out a written request. Both O'Brien and Drantz deny that Guido asked for this. Johnson Controls attempts to minimize Drantz's contradiction by suggesting that Drantz was possibly not present when this was stated, but this argument is not credible. According to Guido, the meeting with O'Brien started with a discussion of floor plans, then moved on to a discussion of the work being performed, and concluded with the drain down request. If Drantz missed any part of the meeting, it is agreed that he would have missed only some of the beginning. If Guido had asked O'Brien to fill out the form at the *beginning* of the meeting—which makes no sense since according to Guido they were not yet discussing any drain down requests—then it is possible that Drantz may have not been present to hear the request, but it is incredible that O'Brien would not have immediately complied by filling out the form. The form was short, containing only nine simple questions, and the meeting lasted fifteen minutes, leaving O'Brien plenty of time to complete the form.

Guido also claims that he was assured by O'Brien that O'Brien would deliver the form to him before work on the sprinkler system commenced. This is also illogical, for Guido knew that

12

work would begin on March 11 before Guido arrived at his office. Finally, Michael Clark testified without contradiction that in other instances he had not been required to fill out a form, further undercutting Guido's testimony on this issue.

Guido also states that he asked O'Brien three times, within a span of two minutes, which floor was to be drained down, and was told three times in a span of two minutes that it was to be six. O'Brien and Drantz agree on the number of times the question was posed. But Guido further testified that he then asked O'Brien if he meant six, and *not five*, because Guido thought it was odd that they had been discussing five for so long, and now O'Brien was asking only for six. This would have been the fourth time Guido asked O'Brien which floor to drain down, which contradicts the testimony of both O'Brien and Drantz. Furthermore, Drantz was specifically asked if he recalled Guido ever asking about the fifth floor, and Drantz testified that he does not recall this question being asked.

Drantz also testifies that *he* asked O'Brien if the drain down was for floor six. Both O'Brien and Guido testify that this never happened—that Drantz never asked O'Brien any questions during this meeting.

Finally, Drantz and Guido testified that although there was no confusion between the parties, the repeated questioning was necessary because O'Brien appeared rushed and in a hurry. Yet the meeting lasted fifteen minutes, during which time the three men not only retrieved blueprints, but also discussed the work that was to be done. Again, Guido testified that the drain down request was not made until after the prints had been retrieved and the work had been discussed, and that O'Brien was with him the entire time. If O'Brien were truly rushed or in a hurry, it would have made more sense for him to have asked for the drain down while Guido and/or Drantz were finding the blueprints. If O'Brien were in a great rush, it would also have been unlikely that he would have

13

taken the time to explain any of the construction plans to Guido and Drantz since it was not necessary for Johnson Controls to be informed of them. The suggestion that O'Brien was so rushed and in such a hurry that he stated the wrong floor, three or four times, does not appear consistent with the rest of the testimony.

Guido finally testified that he wrote the work order on the dry erase board within seconds of O'Brien's having left the office. There is some disagreement between Guido, Drantz, and Fergus over what was written, but it is difficult to imagine Guido making a material mistake so quickly after a request had been made—*i.e.*, by leaving an entire sprinkler system off of the drain down work order.

In the end, the court must decide which of two versions of events to believe. Given the lack of disinterested witnesses to the conversation between O'Brien, Guido, and Drantz, this is a classic "he said"–"he said" quandary. Neither side's testimony makes complete sense; it is clear that either O'Brien or Guido made a mistake, but it is hard to reconcile how either of them could have done so. However, O'Brien's repeated discussion of work to be performed on the fifth floor, starting at the planning meeting and continuing the next day when speaking to Peck and Nowak, lends his testimony slightly more credibility, especially considering the inconsistencies in Guido's and Drantz's testimony regarding what occurred during the fifteen-minute meeting. The court therefore finds that O'Brien requested for both the fifth and sixth floors to be drained down. It follows that Johnson Controls had a duty to drain down both the fifth and sixth floors, and that they breached that duty by failing to drain down the fifth floor.

**B.     Proximate Causation**

Johnson Controls next contends that its breach was not the proximate cause of the flooding. Here the focus shifts away from the facts and toward the law—there is no question that the last

14

person to have an opportunity to avert the flood was Nowak, who failed properly to confirm that the system was drained down before he began his work. The question is whether Johnson Controls' failure to drain down the fifth floor was also a proximate cause of the flood.

As the Illinois Supreme Court has recently explained,

> the term "proximate cause" describes two distinct requirements: cause in fact and legal cause. A defendant's conduct is a "cause in fact" of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury. A defendant's conduct is a material element and substantial factor in bringing about the injury if, absent that conduct, the injury would not have occurred. "Legal cause," by contrast, is largely a question of foreseeability. The relevant inquiry is whether "the injury is of a type that a reasonable person would see as a likely result of his or her conduct."

*Abrams v. City of Chi.*, 811 N.E.2d 670, 674–75 (Ill. 2004) (citations omitted). However, there exists "a special subset of proximate cause cases involving injuries caused by the intervening acts of third persons." *Id.* at 675.

> [In] a situation where the plaintiff's injury results not from the defendant's negligence directly but from the subsequent, independent act of a third person[,] . . . it has been stated that the test is "whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence." If the negligence charged does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury.

*Id.* (citations omitted). There is no dispute that Johnson Controls' breach constitutes a "cause in fact" of Bloomingdale's injury, but Johnson Controls contends that it merely "furnished a condition by which the injury is made possible." The question is "whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence." In the context of this case, the question is whether Johnson Controls could have reasonably anticipated that its failure to drain down the fifth floor could have a probable result of causing a flood.

15

Johnson Controls contends that it merely furnished a condition, nothing more. It also includes, in a footnote, several cases which it contends stand for the proposition that "the failure to follow [specific trade customs, rules or other requirements put in place to avoid accidents] could not be anticipated by a defendant and therefore represents an intervening act of negligence." Def.'s Mem. in Supp. of Mot. for J. on Partial Findings 11 (Doc. No. 226). None of the cases cited are applicable, nor do they stand for as broad a proposition as Johnson Controls contends.[4] "[T]he law is clear that conduct does not become an unforeseeable intervening cause solely because it violates

---

[4] In *Reddick v. General Chemical Co.*, 124 Ill. App. 31 (1905), a shipper of sulphuric acid was not liable because he had done nothing negligent—the unloader, who permitted an untrained employee to unload the product, was the only source of negligence; here, Johnson Controls has acted negligently.

*Longnecker v. Ill. Power Co.*, 381 N.E.2d 709, 714 (Ill. App. 1978) involved a patently dangerous condition—a power pole that was patently damaged and not safe to climb. Given the patent danger and the expertise of the plaintiff in climbing poles, the court found that his decision to climb the pole was an intervening event. Here, the dangerous nature of the charged sprinkler system was not patent since Johnson Controls had represented it was empty.

*Shank v. H.C. Fields*, 869 N.E.2d 261, 267 (Ill. App. 2007) involved a traffic lane closed for construction, a merging of many cars, and a multi-vehicle accident; the court reasoned that an inattentive driver is always a risk. Yet in this case, the negligence of Nowak would not have posed a risk if the system had been drained.

In *Quintana v. City of Chi.*, 596 N.E.2d 128, 129-30 (Ill. App. 1992), an inoperative traffic light was not deemed to be a proximate cause of a traffic accident because the drivers of the two cars failed to follow additional statutes that direct that inoperative lights be treated as stop signs. *Quintana* is the closest case to support Johnson Controls' argument, but *Quintana* involved a controlling *statute*, not a professional code, and also involved a patently dangerous situation.

*Podraza v. H. H. Hall Const. Co., Inc.*, 365 N.E.2d 944, 949 (Ill. App. 1977) involved an electrical line buried in a construction area, and the plaintiff was injured due to his "careless method of removing the line from the ground, a method neither necessary nor prudent, that caused his injury." *Id.* at 949. The court reasoned that the existence of the wire in the construction area "furnished a condition," but the only allegations against the company were that it failed to supervise installation and maintenance of the line properly, and that it allowed the line to exist in the construction site. *Id.* Even were the defendants so negligent, this negligence had nothing to do with the injury to the plaintiff, who fell and hurt himself while tugging the line out of the ground. This case perhaps best exemplifies the requirement of foreseeability—the alleged negligent act of improperly installing the wire would not have reasonably foreshadowed that a worker would injure himself when he later tried to pull the wire out of the ground by yanking on the wire and losing his balance. In the case at bar, the potential for harm was far more obvious.

the law." *Mack v. Ford Motor Co.*, 669 N.E.2d 608, 615 (Ill. App. 1996). Rather, the focus remains on whether the second negligent act was reasonably foreseeable. *Id.*

Johnson Controls' actions did more than merely furnish a condition. Johnson Controls was aware that work would be performed on the sprinkler system, and Johnson Controls should have been aware that if the fifth floor system were opened, a flood would occur. Had Johnson Controls not made any representations that the system had been drained, then its argument would carry greater weight, but here, Johnson Controls represented to O'Brien that the drain down request had been completed. It is reasonably foreseeable that a sprinkler fitter may rely upon that representation, even if the fitter himself acted negligently in the process.

Johnson Controls' breach of its duty to Bloomingdale's served as a proximate cause of the flood that occurred on March 11, 2003. The court declines to reach Bloomingdale's additional arguments regarding *res ipsa loquitur* and that Johnson Controls acted negligently by failing to follow its own internal regulations.

### III. CONCLUSION

For the reasons set forth above, the Court finds that Bloomingdale's has established that Johnson Controls was negligent and is liable. The amount of damages remains to be determined.

Bloomingdale's findings of fact and memorandum of law in the issue of damages is to be submitted by July 14, 2009. Johnson Controls' response is to be submitted on August 4, 2009. Bloomingdale's reply is to be submitted on August 18, 2009. If both parties believe that a settlement conference with the magistrate judge would be helpful, they should contact the courtroom deputy and request a referral.

ENTER:

    /s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 8, 2009