**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MACY'S, INC., and ) <br> BLOOMGINDALE'S, INC., ) <br> ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> v. ) <br> ) <br> ) <br> JOHNSON CONTROLS WORLD ) <br> SERVICES, INC. and ) <br> GLOBAL FIRE PROTECTION ) <br> COMPANY, ) <br> ) <br> **Defendants.** ) | Case No.: 04 C 0879 <br><br> Judge: Gottschall <br><br> Magistrate Judge: Cole |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT WITH RESPECT TO DAMAGES**

Plaintiffs, Macy's, Inc. ("Macy's") and Bloomingdale's, Inc. ("Bloomingdale's"), by and through their undersigned counsel, and for their Proposed Findings of Fact With Respect to Damages, hereby states as follows:

**STIPULATED FINDINGS OF FACT**

The following facts are uncontested pursuant to the Agreed Statement of Uncontested Facts (Schedule A) in the Final Pretrial Order.

22. After the coupling blew off, water flooded throughout the Premises

23. The first five floors of the Premises sustained water damage to its fixtures and merchandise as a result of the flood.

24. The flood occurred prior to Bloomingdale's business hours on March 11, 2003. Bloomingdale's did not open for business on March 11, 2003.

25. Bloomingdale's opened for business on March 12, 2003, but with limited merchandise sections and floors open for customer access.

1

26. The following invoiced and paid items, in the total amount of $155,440.70, are for reasonable and necessary charges which were incurred in responding to the flood that is the subject of this litigation, and are damages suffered by Plaintiffs to which Defendants have no objection:

| | |
|---|---|
| - Munters Moisture Control | $53,090.86 |
| - Universal Restoration Services | $81,483.31 |
| - Kellermeyer Building Services | $4,695.00 |
| - Sensormatic Repairs | $8,154.78 |
| - ADT System Repairs | $845.51 |
| - Absolute Security Management | $172.00 |
| - Clayton Environmental Services | $6,999.24 |

## ADDITIONAL PROPOSED FINDINGS OF FACT

1. In March of 2003, Dan Irha was employed as the assistant store manager of operations for the Bloomingdale's stores located at 900 North Michigan Avenue and "Medinah". [Trial Transcript ("TT"), 584:12-15.] Irha had been employed in that position for about two years at the time. [*Id.* at 584:16-18.] Irha was employed at other retail establishments prior to working at Bloomingdale's, including Kaufmann's, Bradley's, Calder Department Store and K-Mart, over a period of more than twenty years. [*Id.* at 585:6-14.]

2. Irha arrived at the store around 9:00 a.m. on March 11, 2003. He was advised of the flood at around 7:00 a.m. but could not reach the store any earlier due to traffic. [TT, 588:1-5.]

3. When Irha arrived he observed water cascading down through the parking garage and pouring out of light fixtures in an underpass between the parking garage and building. [TT, 588:6-20.] When Irha entered the first floor of the Premises, he saw people running around and water everywhere. [*Id.* at 588:21-589:5.] The escalators were not operational. [*Id.* at 589:13-16.]

4. As Irha began to assess the situation, he first prioritized the safety of the Bloomingdale's personnel at the store, and had them move away from live wires and other potential hazards. [TT, 589:19-590:24.]

5. Irha then confirmed with store management in New York that the store would not be opening for business that day. [TT, 591:1-8.]

6. Irha then began assessing which employees should stay to assist with the cleanup efforts and which nonessential employees should be sent home. [TT, 591:10-16.]

7. Irha retained Bloomingdale's management who were already at the store to assist with the moving of merchandise as the water continued to pour down. [TT, 610:2-9.] Irha coordinated with each floor manager to continue to move merchandise out of the way of cascading water in order to save as much merchandise as possible from becoming damaged. [*Id.* at 610:9-21.]

8. Mike Clark was first advised of the flood at the Premises when Chris O'Brien called him while Clark was traveling in his car down to the city. [TT, 365:22-366:2.] After that phone call, Clark made phone calls to several superintendants at other jobs in the city to get manpower down to the Premises. He also called other subcontractors in the area and asked that they bring manpower and equipment down to the Premises. [*Id.* at 366:8-19.]

9. There were already a number of subcontractors and MJ Clark employees at the Premises who were performing work as part of the remodeling on the fifth and sixth floors. Those subcontractors included Robinette Demolition, Commodore Electric, and Grainer, the drywall contractor. [TT, 367:1-9.]

10. Robinette had eight men working at the jobsite, and ultimately brought 24 additional workers in to respond to the flood at the Premises on March 11, 2003. [TT, 367:18-23.]

11. Commodore Electric had four electricians and brought additional workers for a total of 10 workers to respond to the flood at the Premises on March 11, 2003. [TT, 368:1-7.]

12. Mike Clark arrived at the Premises around 7:00 a.m. on March 11. [TT, 369:3-7.] When he arrived, he observed soaked flooring, both carpeting and wood, bulging ceiling tiles, and water dripping everywhere, including on items for sale. [*Id.* at 369:20-370:3.]

13. Mike Clark met with Tom Robinette, the owner of Robinette Demolition, and Dan Irha, the Bloomingdale's store manager, to begin to coordinate the cleanup effort. [TT, 370:21-371:5.] They met every hour to discuss the progress of the cleanup. [*Id.* at 372:6-7.]

14. The power was initially shut down during the flood, which necessitated extension cords to be run out into the mall adjacent to the Premises for power, but a power source was quickly restored by the Commodore Electric electricians so that equipment could be used to begin cleaning up the water. [TT, 371:6-14.]

15. Shop vacs were brought in by various subcontractors and other sources to clean up the water. It was estimated that 50 to 60 shop vacs were used. [TT, 371:15-22.] These shop vacs were necessary to expedite the cleanup of the water that had spilled out of the sprinkler system. [*Id.* at 371:23-372:2.]

16. The cleanup effort was initially focused on the first, second and third floors, so that the store could open for business the following day. [TT, 372:8-15.] The efforts of all of the workers that were part of the cleanup effort, including many workers working into and through the night, was necessary so that the store could be opened for business the following day. [*Id.* at 372:19-25.]

17. MJ Clark kept track of which of his employees worked on the cleanup effort at the Premises in the days and weeks following the flood and generated expenses MJ Clark incurred as a result of the flood. [TT, 374:11-24.] The MJ Clark subcontractors who assisted in

3

the cleanup effort, including Robinette Demolition, Commodore Electric and Grainer, submitted invoices to MJ Clark for the expenses and labor incurred as a result of the cleanup effort. [*Id.* at 374:16-21.]

18. MJ Clark submitted an invoice to Bloomingdale's for the expenses incurred by MJ Clark and the aforementioned subcontractors in responding to the flood and the cleanup effort. [TT, 374:25-375:3.] Joint Exhibit 30 is a copy of that invoice and supporting documentation. [*Id.* at 375:14-18.] The total invoice submitted by MJ Clark and charged to Bloomingdale's for that portion of the cleanup effort was $168,583.16. [*Id.* at 376:1-3.] All of the charges contained in that invoice were fair and reasonable for the work that was done, and were deemed necessary for the cleanup of the Premises. [*Id.* at 376:4-13.]

19. Bloomingdale's paid MJ Clark a negotiated amount of $150,000.00 in full satisfaction of the MJ Clark invoice for the initial cleanup effort. [Exhibit 41; TT, 376:14-377:3.]

20. Curtis Yearwood is a licensed public adjuster in the State of Illinois, who currently owns and is employed at Alpha Adjusting Company. [Trial Transcript dated October 28, 2008 ("TT-2"), 7:18-8:2.] Mr. Yearwood has worked as a public adjuster since 1974. [*Id.* at 8:6-18.] Mr. Yearwood is licensed in Illinois, Indiana, Michigan and Florida, and is the president of the Midwest Public Adjustors Associations. [*Id.* at 9:7-15.]

21. Mr. Yearwood has handled adjusting services for clients that are retail establishments and sell merchandise, including clothing stores, electronics stores, shoe stores, hotels, apartment building, and residential locations. [TT-2:9:16-23.] Mr. Yearwood adjusts losses relating to damage arising out of wind, fire, theft, and water damage. [*Id.* at 10:5-8.]

22. Wayne Majka, the Bloomingdale's building engineer, purchased 15 wet vacs from Grainger on the day of the flood so that these workers could use the wet vacs to remove the water from the floors as quickly as possible. [TT, 102:12-15, 103:15-24.]

23. Grainger invoiced Bloomingdale's $2,501.06 for the wet vacs and Bloomingdale's paid the invoice. [Exhibit 18; TT, 104:4-15.]

24. As a result of the flood clean-up, about half of the wet vacs were no longer usable after being used during the cleanup. [TT, 104:16-22.]

25. Yearwood found the purchase of the wet vacs to be a valid expense that directly assisted in reducing any further damages and removing the water in an expedient fashion. [TT, 15:7-16.]

26. The purchase of the wet vacs was considered an emergency expense and should not be subject to depreciation. [TT, 16:20-17:6.]

27. As the water leaked onto and through the premises, water cascaded down and streaked glass enclosures surrounding the escalators. [TT, 602:14-25.] The water continued to cascade down for quite a while and the streaks were not noticed until some time after the initial

4

cleanup. [*Id.* at 602:23-25.] Kellermeyer cleaned these streaks and charged Bloomingdale's $825 for the cleanup. [*Id.* at 602:7-13, 603:1-2; Exhibit 41.]

28. The elevators and escalators at the premises sustained significant damage due to the flood, necessitating repair work over a period of weeks. [TT, 795:7-12.] Thyssen Krupp issued its invoice and Bloomingdale's paid Thyssen Krupp $108,880.59 for these repairs. [*Id.* at 834:13-21; Exhibit 22; 829:19-23.] The invoice was specifically prepared just to relate to the repairs that occurred as a result of the flood. [*Id.* at 797:1-6.]

29. As a result of the flood, equipment and furniture in the loss prevention department was destroyed by water. The soft ceiling above the furniture and equipment collapsed after becoming saturated with water, and water continued to pour onto the furniture, causing it to be destroyed. [TT, 604:2-17.] Exhibit 25 is a complete listing of all of the furniture that was purchased to replace the damaged items in the office. [*Id.* at 604:18-605:2.] The replaced items included chairs and office supplies. [*Id.* at 605:3-9.] All of the items reflected in Exhibit 25 replaced existing items that had been damaged as a result of the flood. [*Id.* at 605:10-13.]

30. The cost to replace the furniture totaled $792.31. [TT-2, 17:24-18:1; Exhibit 25.]

31. Yearwood calculated a depreciated amount of $475.39 as a fair indication of the value of the office equipment and furniture at the time of the flood. [TT-2, 20:7-13.]

32. Macy's normal protocol on large catastrophic losses was to bring in Engle Martin Adjustment Services to help manage the situation. [TT, 841:17-22.] Engle Martin did attend and submitted an invoice to Macy's in the amount of $3,611.13, which was paid by Macy's and was ultimately charged back to Bloomingdale's. [*Id.* at 841:23-842:7; Exhibit 29.]

33. Bloomingdale's paid all of the employees who arrived for work but were sent home because of the flood. [TT, 610:22-24.] It is standard Bloomingdale's policy that if the building could not be opened, the employees were entitled to payment for their entire work day. [*Id.* at 611:1-5.]

34. Some employees who were scheduled to work on that day had not arrived at the store before the flood and ensuing cleanup occurred. [TT, 611:7-10.] Bloomingdale's attempted to contact all employees who were scheduled to work on that date and advise them that they did not need to come in. [*Id.* at 611:11-20.] Those employees who were not contacted prior to arriving and did come in received pay for the day, pursuant to Bloomingdale's corporate policy. [*Id.* at 611:21-612:1.]

35. The first column of the labor category on Proposed Exhibit 17, with respect to damages in the amount of $13,800, was calculated by taking the listed employees' hourly rates and multiplying by the time they worked or were scheduled to work on the day of the flood. [TT, 612:6-18.]

36. Irha worked with the human resources department in finding out who had to be paid for work on the day of the flood. [TT, 612:25-613:3.] Exhibit 31a is a document

5

establishing which employees were to be paid for work on that date. [*Id.* at 613:17-22.] Irha satisfied himself that this document was accurate with respect to hours worked, department identification, and totals. [*Id.* at 614:1-3.]

      37.     Exhibit 31b reflects the Bloomingdale's payroll for additional work by Bloomingdale's employees that was done the day following the flood which included continuing to pull merchandise away from walls in order to enable MJ Clark to continue with its efforts to replace wetted drywall and ceiling tiles. [TT, 614:13-21.] Irha worked with the human resources department to obtain the information and he verified it to make sure it was accurate. [*Id.* at 615:1-9.] Irha satisfied himself that the additional payroll in the amount of $1,992.27 was an accurate and correct calculation. [*Id.* at 615:10-11.]

      38.     Exhibit 31c reflects the Bloomingdale's payroll for Bloomingdale's employees who worked at the Bloomingdale's Medinah store, at a different location. [TT, 616:20-22.] These employees were brought to the Premises to assist with moving merchandise away from walls in order to enable MJ Clark to continue with its efforts to replace wetted drywall and ceiling tiles. [*Id.* at 616:12-19.] Irha worked with the human resources department to obtain the information and he verified it to make sure it was accurate. [*Id.* at 616:2-4.] Irha satisfied himself that the additional payroll in the amount of $761.90 was an accurate and correct calculation. [*Id.* at 616:8-10.]

      39.     Exhibit 31d reflects the Bloomingdale's payroll for Bloomingdale's employees who assembled into teams and followed MJ Clark workers around as they performed drywall repairs, removing and reorganizing merchandise. [TT, 616:11-25.] Irha worked with the human resources department to obtain the information and he verified it to make sure it was accurate. [*Id.* at 617:1-10.] Irha satisfied himself that the additional payroll in the amount of $4,524.04 was an accurate and correct calculation. [*Id.* at 617:11-14.]

      40.     The expenses reflected in Exhibit 31a-d inclusive would not have been incurred but for the flood. [TT, 617:20-618:1.]

      41.     Yearwood made additional calculations to the labor category of damage to apply Social Security and other overhead in the amount of 15%, as well as a supervision cost of 10%, and calculated that Bloomingdale's is entitled to $29,508.00 for its use of additional labor as a result of the flood. [TT-2, 27:17-23.] These were additional charges that Bloomingdale's incurred to defer or reduce a future loss. [*Id.* at 28:2-9.]

      42.     Irha handled accounting for the merchandise that became destroyed by the flood. As they went floor by floor pulling the merchandise away, any merchandise that was wet was taken to a central location. This wetted merchandise was identified and inventoried so that they had a concise list of what was actually damaged. [TT, 618:5-15.]

      43.     Irha repeatedly visited the location with the wetted merchandise and personally viewed the damaged items, and satisfied himself that the items were actually wetted. [TT, 619:2-7.] If an item were wet it was set aside. [*Id.* at 619:8-10.] Bloomingdale's cannot sell merchandise that has been wetted. [*Id.* at 619:11-13.]

44. Callan Salvage & Appraisal was called in to handle the actual salvage process. [TT, 619:14-21.] Callan sent in a representative to personally identify the items and oversee the inventory process, including the boxing and shipping of the items. [*Id.* at 619:22-620:2.]

45. The Bloomingdale's system has the ability to scan all of the tickets of all the merchandise that's there. Each item is assigned a number. The system also provides the retail cost of each item. [TT, 620:14-22.]

46. Exhibit 33 is the inventory of items that were set aside as damaged and ultimately given to the salvor. [TT, 621:1-9; See also Exhibits 33a, b.] The inventory contains both the cost to Bloomingdale's and the retail cost of each item. [*Id.* at 622:1-14.]

47. The total cost to Bloomingdale's for all damaged items was $103,587.95. The total retail cost for those items was $194,129.31. [TT, 622:15-21.]

48. Exhibit 32 is a document prepared by Callan and accurately reflects the efforts of Callan with respect to the salvage operation. [TT, 623:1-8.] The net proceeds of the salvage effort were $26,397.39, leaving Bloomingdale's with a balance of loss for destroyed merchandise in the amount of $77,190.56. [TT, 832:6-833:13.]

49. The net proceeds of the salvage effort equaled about a 25% net recovery, which falls within the typical range of recovery for such salvage efforts. [TT-2, 29:13-30:7.]

50. The cost of salvage did not include the cost of wrapping up and shipping the salvaged merchandise to the purchaser. Bloomingdale's separately incurred the cost of shipping those items in the amount of $596.60. [TT, 605:15-606:3, 842:18-843:1.]

51. Irha was knowledgeable about the number of customers who came through the store on a daily basis. [TT, 624:20-22.] He was knowledgeable about the total sales that occurred on a day-to-day basis at the store. [*Id.* at 624:23-625:1.] In his position as assistant store manager, Irha received a daily plan relating to overall business activity and sales. [*Id.* at 625:2-8.] Irha also received information on how much profit the store made. [*Id.* at 625:12-14.]

52. Irha observed that the retail business activities at the store were affected by the flood, in that the store did not open for business on the day of the flood. [TT, 627:22-628:9.] In the days following the flood, Irha personally observed that customers were not able to go into certain areas of the store where flood cleanup was taking place. [*Id.* at 628:10-25.]

53. In the weeks and months following the flood, there was a continuous disruption of the sales area as various store areas were repaired and restored that would have negatively impacted the store's business income. [TT-2, 32:8-22.]

54. Brad Boyle was the Operating Vice President, Risk Management, for Bloomingdale's at the time of the loss. [Deposition of Brad Boyle ("Boyle Dep"), 5:17-25.] Mr.

7

Boyle handled about a dozen business interruption claims in his experience in this position prior to the flood [*Id.* at 55:21-56:2.]

55. As a result of the extensive damage from the flood, the store was totally closed to the public for one day, and portions of the store were closed in the several days following the flood. [Boyle Dep., 50:8-20.] Boyle calculated Bloomingdale's business income loss as a result of the store closing by reviewing the store trend for the week prior, the week of the flood, and the projected plan for the day of the flood and the three days following the flood, and applied the margin factor to the loss from those days. [*Id.* at 51:3-13; Exhibits 34a, b.]

56. Boyle calculated Bloomingdale's business income loss for the day of the flood and the three days subsequent to the flood as equaling $58,356.94. [Boyle Dep., 51:1-52:1; Exhibits 34a, b; TT-2, 30:8-18.] Yearwood confirmed that the calculation performed by Boyle was a proper method for determining the business income loss suffered by Bloomingdale's in the four days following the flood. [TT-2, 32:23-33:4.]

57. As a result of the flood, Bloomingdale's incurred expenses in the amount of $470.59 for excess energy utilization, which was necessitated by running generators and power 24 hours per day in order to assist with the clean-up and repair work. [Exhibit 35; TT, 712:17-713:18.]

58. Bloomingdale's incurred $5,947.32 in travel and related expenses for various employees who traveled to the Premises in Chicago to address the loss. [TT, 843:9-844:13; Exhibit 36.] Ozzie Velez had to purchase clothing while in Chicago because he traveled to Chicago from a warmer climate on an emergency basis and did not have proper clothing for the winter weather. [*Id.* at 706:2-707:18.]

59. As a result of the flood, a fax machine used by the human resources department was damaged and required replacement. [TT, 632:2-10.] A new fax machine was purchased by Bloomingdale's at a cost of $800.00. [*Id.* at 845:19-22.]

60. Yearwood calculated the depreciation on the fax machine to determine its value at the time of the flood, which was calculated to be $480.00. [TT, 34:22-35:7.]

61. As a result of the flood, a table used for displaying merchandise, referred to as an INC Fixture, was damaged and had to be replaced. [TT, 631:17-22.] The cost to replace the table was $2,297.48. [*Id.* at 714:10-20; Exhibit 37.] The table was in good shape prior to the flood. [*Id.* at 772:1-2.]

62. Yearwood calculated the depreciation on the fixture to determine its value at the time of the flood, which was calculated to be $1,952.86. [TT-2, 34:1-13.]

63. Two cash wrap stands made of laminate on the fourth floor of the store were damaged by the flood. The water that seeped into the floor eventually began to crawl up the cash wraps and cause the laminate to become detached from the particleboard below. [TT, 640:18-

8

23.]  These cash wrap stands could no longer be used on the sales floor. [*Id.* at 641:10-18; 785:9-23.]

64. The cost to replace the cash wrap stands is $24,000 each, or $48,000. [TT-2, 35:16-22.]

65. Yearwood calculated the depreciation on the cash wrap stands to determine their value at the time of the flood, which was calculated to be $33,600.00. [TT-2, 35:23-36:1.]

66. The cash wrap stands were custom-made, one-of-a-kind pieces. [TT-2, 36:5-16.]

67. An area of wall and ceiling on the fifth floor sustained water damage as a result of the flood. [TT, 632:11-23.]  The estimated cost to repair this area is $10,450.00. [Exhibit 38b.]

68. Some shelving was ruined by water damage and had to be removed. [TT, 641:19-642:3.]  The estimated cost to repair the shelving is $1,600.00. [Exhibit 38b.]

69. The wood flooring on certain floors in the store was damaged by the water to the point where the various pieces of hardwood began to separate and became dangerous for pedestrians to walk on. [TT, 636:9-16.]

70. At the time of the flood, attempts were made to salvage the carpeting by pulling up the carpet and removing and replacing the padding underneath, and allowing the carpeting itself to dry off with fans. [TT, 635:6-13.]  In addition, the carpets were shampooed by Kellermeyer, in an effort to remove as much water and dirt as possible. [*Id.* at 635:14-25.]

71. Because of the significant water damage to the flooring at the premises, large portions of the hardwood flooring on the third floor buckled and had to be pulled out on the night of the flood. [TT, 642:17-24.]  The sub-flooring was temporarily covered with a remnant piece of carpet that was used for Christmas displays, in order to allow that portion of the store to open for business the next day, and until the flooring could be replaced with a more permanent solution. [*Id.* at 643:4-17.]

72. Subsequent to patching in the "Christmas carpet", carpeting was installed over a large area where the hardwood flooring had been torn up. [TT, 671:1-16, 673:18-674:7.]

73. For large areas such as the area on the third floor, carpeting can be installed much quicker than hardwood flooring, and with much less disturbance to the retail area. [TT-2. 39:2-5.]  The temporary laying down of carpeting over an area in which hardwood flooring previously existed, and where it is intended that hardwood flooring will be replaced is a reasonable expense to open up the retail area and to offset and mitigate any income losses. [*Id.* at 38:17-39:15.]  The installation of wood flooring takes much longer than carpeting because each individual piece is glued down or nailed separately. [TT, 732:7-16.]  Installation of wood requires about 30% more labor. [*Id.* at 733:1-6.]

9

74. MJ Clark conducted some work subsequent to the initial cleanup effort on the third floor of the Premises. [TT, 377:22-25.] MJ Clark tore out the wood flooring on the third floor that had been damaged as a result of the flood, which was buckling and giving way. [*Id.* at 375:11-16.] The buckling floor presented a safety hazard. [*Id.* at 375:17-18.] The work was done in two stages, and consisted of removing cash wraps and fixtures, putting up barricades, doing demolition, floor preparation, and installing the new carpeting, and returning the cash wraps and fixtures. [*Id.* at 380:15-381:2.]

75. MJ Clark submitted a proposal for the work on the third floor in the amount of $99,400.00. [TT, 380:2-11.] MJ Clark was paid for this work in that amount. [Exhibit 41; *Id.* at 859:20-860:3.]

76. MJ Clark did not supply the carpeting; the carpeting was purchased by Bloomingdale's, but installed by MJ Clark. [TT, 381:8-13; 860:4-6; Exhibit 40a.] The carpeting that was purchased in the amount of $44,514.00 had to be purchased to cover that part of the third floor that had been damaged by the flood. [*Id.* at 719:13-17.]

77. Once the initial cleanup effort of MJ Clark and subcontractors was completed, there was still additional work to be done in order to restore the Premises to its condition prior to the flood. [TT, 377:10-13.]

78. The Premises presents various special challenges and circumstances for general contractors when bidding on and performing work there. [TT, 363:14-17.] For example, the Premises relies on a shared dock with other tenants, there is only one elevator for construction use, store rules which restrict moving men and equipment across the sales floor, removing garbage, noise, odors, or any disruption to the store itself. [*Id.* at 363:20-364:3.] Construction must be done in small phases so as to keep portions of the store open, and equipment must be moved from the work site to a staging area every day. [*Id.* at 364:4-9.]

79. Conducting construction work at the Premises also poses a challenge to scheduling and dealing with labor. The labor follows the schedule, and the schedule is often interrupted by the aforementioned logistical issues. [TT, 364:10-21.]

80. The aforementioned logistical issues affect how jobs are bid at the Premises. When Clark bids a job at the Premises, he does so with all of these logistical issues in mind, which usually means the project lasts longer and is more expensive. [TT, 365:14-21.]

81. Areas of carpeting that are still on the floors sustained rust stains that are still present. [TT, 634:4-20, 635:2-5.] Rust stains made by the chrome steel clothing racks are still visible today on the carpeting on the third and fourth floors. [Id. at 646:1-15.]

82. The carpets were cleaned numerous times in the days after the flood, and have been cleaned on a regular basis pursuant to Bloomingdale's contract with Kellermeyer since that time. [TT, 646:16-648:7.]

10

83. Prior to the flood, the carpeting on the third and fourth floors was in good shape, and there were no plans to replace it. [TT, 648:8-14.] The hardwood flooring on the third floor was also in fine shape, and there were no plans to replace it. [*Id.* at 651:1-11.]

84. Mike Clark participated in a number of walk-throughs throughout the Premises, with Dan Irha of Bloomingdale's, Lance Woodard of Federated Department Stores, and Ozzie Velez of Bloomingdale's, to view the damages that had occurred as a result of the flood. [TT, 382:12-19.] During these walk-throughs, they extensively examined the Premises to find areas of flood damage that still needed to be repaired. [*Id.* at 382:20-23.] This was a concerted effort to determine the nature and extent of all of the damages that had been done to the Premises as a result of the flood. [*Id.* at 382:24-383:3.]

85. The fourth floor consists of 35-36,000 square feet. The third floor has about the same square footage. [TT, 731:2-7.]

86. Mike Clark provided Mr. Velez with the square footage measurements for the third and fourth floors. [TT, 733:24-734:1.] These measurements are indicated on Proposed Exhibit 17. [Id. at 734:2-4.]

87. Mr. Velez worked with the Store Design department to obtain pricing for replacement carpeting for those sections of the third and fourth floors as reflect on page 2 of Proposed Exhibit 17. [735:4-13; Exhibit 40a.] Store Design is the design department that sets the standards for carpeting, flooring and fixtures for a particular store area. [*Id.* at 735:14-17.] Mr. Velez worked with Store Design on a regular basis to obtain pricing for carpeting. [*Id.* at 735:18-736:6.]

88. Based on the information he received from Store Design, Mr. Velez provided Mike Clark with a carpeting cost allowance of $35.00 per square yard so he could calculate a bid for the replacement of the carpeting. [TT, 742:18-744:5; Exhibits 38a, b.] This cost allowance did not include the price of installation or any other related costs. [*Id.* at 788:5-14.]

89. Subsequent to the walk-throughs, Bloomingdale's requested that MJ Clark submit a proposal to complete the repairs to the Premises, and MJ Clark did so. [TT, 383:4-16.] Joint Exhibit 38a is the initial proposal that MJ Clark submitted on April 16, 2003 for those repairs. [*Id.* at 384:6-10.]

90. MJ Clark subsequently submitted a revised proposal for the same scope of repairs in July of 2004, as set forth in Joint Exhibit 38b. [TT, 386:3-13.] Mike Clark and Dan Irha conducted several more walk-throughs prior to preparing the revised proposal. [*Id.* at 386:24-387:8.]

91. The proposed repairs in Joint Exhibit 38b consist of repairs that are reasonable and necessary in order to repair areas of the Premises that were damaged as a result of the flood. [TT, 387:11-19.]

92. Bloomingdale's obtained a competitive bid for the work remaining to be done to repair the flood damage from Valenti, a general contractor. [TT, 857:11-858:5; Exhibit 39.] The Valenti estimate was higher than the M.J. Clark estimate for the work to be performed. [Id. at 858:9-18.]

93. The total cost to replace the carpeting in these areas is $302,618.00, based on the estimate provided by Clark. [Exhibit 38b; Proposed Exhibit 17; TT, 848:8-849:21.]

94. The carpeting that was ruined as a result of the flood was custom carpeting that was installed in the premises several years prior to the flood. [TT, 649:23-650:7; 720:7-13.] Custom carpeting is more expensive than off-the-shelf carpeting. [*Id.* at 720:20-22.]

95. The average useful life of carpeting is 10 years. [TT, 677:15-17; 721:11-722:4.] The average useful life for hardwood flooring is about 20 years. [*Id.* at 722:15-22.] Hardwood flooring can last much longer- up to 100 years, and a 20-year life is a conservative estimate. [TT-2, 44:10-23.]

96. The total cost to replace the hardwood flooring on the third floor that had to be removed as a result of buckling and staining from the flood is $244,025.00, based on an estimate provided by Clark. [TT, 846:5-23.]

97. Bloomingdale's has a policy with regard to wood flooring in that they try to keep it as long as they can, because it holds up well and is easy to refinish. [TT, 722:23-723:5.]

98. Bloomingdale's applied a depreciation calculation to the entire cost of purchasing and replacing the flooring in determining a fair amount to deduct in order to account for the use of the damaged flooring that it has received since the flood. [TT, 851:15-852:6.]

99. The numbers in the righthand column denoted by "years" on the second page of Proposed Exhibit 17 indicate the number of years the carpeting and hardwood flooring had been in place at the time of the flood. [TT, 695:1-15.]

100. Bob Bowman, Operating Vice President for Risk Management, made the depreciation calculations as set forth in Proposed Exhibit 17 by taking the percentage of usable life for each area of hardwood flooring and carpeting that still needed to be replaced, and by deducting that number from the replacement cost. [TT, 831:7-9; 856:9-857:2.] Bowman calculated depreciation on the total estimate for purchase of the carpeting, as well as the labor involved in installing the carpeting. [*Id.* at

101. Yearwood made revised depreciation calculations on the cost of replacement of the carpeting and hardwood flooring, calculating depreciation only on the cost of the flooring itself, instead of both the cost of the flooring and the labor and other overhead expenses. [TT-2, 46:13-47:22.]

12

102. Yearwood believes that his depreciation calculations provide one with the best indication of the value of the carpeting and hardwood flooring on the date just prior to the flood. [TT-2, 48:16-22.]

103. Yearwood opined that the damages and betterment received by Bloomingdale's would be fixed as of the date of the loss, and this is the standard that is applied when adjusting similar losses. [TT-2, 50:10-16.] This approach takes into consideration that prices for replacement and installation of carpeting and flooring have increased significantly over the past several years. [Id. at 50:19-51:4.]

104. The total depreciated amount due and owing Bloomingdale's for the damage to the hardwood flooring on the third floor is $233,249.00. [TT-2, 47:4-18.]

105. The total depreciated amount due and owing Bloomingdale's for the damage to the carpeting on the third and fourth floors is $288,526.27. [TT-2, 48:2-15.]

106. If there was a charge incurred or paid by Macy's, that charge was then charged back against Bloomingdale's. [TT, 844:19-21.] Any expenses that are reflected in Proposed Exhibit 17 which have been paid were either paid by Bloomingdale's or ultimately charged back to Bloomingdale's. [*Id.* at 844:22-845:8.]

107. Bloomingdale's has sustained total compensable damages in the amount of $1,307,575.36 as a result of the flood. [TT-2, 51:22-52:8.]


                Respectfully submitted,

                MACY'S, INC., and BLOOMINGDALE'S, INC.


                By: \_\_\_\_\_/s/Stephanie Espinoza_____
                        One of their Attorneys


Dennis Minichello
Stephanie Espinoza
Marwedel, Minichello & Reeb, P.C.
10 South Riverside Plaza, Suite 720
Chicago, IL 60606
(312) 902-1600

**CERTIFICATE OF SERVICE**

    I, Stephanie Espinoza, an attorney, certify that on this 14th day of July, 2009, I electronically filed the above Plaintiffs' Proposed Findings of Fact With Respect to Damages with the Clerk of the Northern District of Illinois via its CM/ECF system, which will send a notice of electronic filing to the following counsel:

- **Myra A Marcaurelle**
  mmarcaurelle@sachnoff.com
- **Robert Alan Roth**
  rroth@sachnoff.com wbrown@sachnoff.com
- **David Zev Smith**
  dzsmith@sachnoff.com bboksa@sachnoff.com
- **Richard Kenneth Wray**
  rwray@sachnoff.com

    /s/ Stephanie A. Espinoza
    Stephanie A. Espinoza