UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MACY'S, INC., and BLOOMINGDALE'S, )<br>INC. )<br> )<br>      Plaintiffs, )<br>   v. )<br> )<br>JOHNSON CONTROLS WORLD )<br>SERVICES, INC. )<br> )<br>    Defendant. )| Case No. 04 C 0879<br><br>Judge Joan B. Gottschall |

## MEMORANDUM OPINION & ORDER

This case arises from a flood that occurred on March 11, 2003 at the department store of plaintiff Bloomingdale's, Inc. located at 900 North Michigan Avenue in Chicago (the "store"). A five-day bench trial was held in May and October 2008. Prior to trial, M.J. Clark, Inc., previously a defendant in this action, settled with Bloomingdale's and plaintiff Macy's, Inc. (collectively, "Bloomingdale's"). After the first four days of trial in May 2008, Global Fire Protection Company, another defendant, settled as well.

Johnson Controls World Services, Inc. ("Johnson"), the remaining defendant, and Bloomingdale's asked the court to first issue its findings of fact and conclusions of law as to liability. The court issued its opinion finding Johnson liable on June 8, 2009. The parties subsequently submitted proposed findings of fact and memoranda of law, and responses thereto, regarding damages.

The court now issues its findings of fact and conclusions of law regarding damages in accordance with Federal Rule of Civil Procedure 52(a). Fed. R. Civ. P. 52(a).

**I.FINDINGS OF FACT**

The court addresses each of the claimed damages in turn.

###### A.      Stipulated damages

The parties have stipulated that the following costs were reasonably and necessarily incurred in responding to the flood:  Munters' Moisture Control, $53,090.86; Universal Restoration Services, $81,483.31; Kellermeyer Building Services, $4,695.00; Sensormatic Repairs, $8,154.78; ADT System Repairs, $845.51; Absolute Security Management, $172.00; and Clayton Environmental Services, $6,999.24.   These stipulated damages total $155,440.70.

###### B.      Grainger vacuum cleaners

Bloomingdale's spent a total of $2,501.06 to purchase 15 wet-dry vacuum cleaners ("wet vacs") to help clean up the water from the flooding.   While the expenditure was a reasonable measure to prevent further damage, it is unclear what value the wet vacs had after the flood cleanup was completed.  According to testimony, some of these wet vacs "burned up" from use.  Yet, there is no evidence specifying the exact number of wet vacs that burned up, the salvage value of those burned-up wet vacs, the value of the still-functional wet vacs, or the value Bloomingdale's has derived from the still-functional wet vacs.

###### C.      Kellermeyer Building Services

In addition to the stipulated damages above, Bloomingdale's provided evidence that it paid Kellermeyer Building Services an additional $825.00 for the cleanup of glass enclosures surrounding the escalators, which had become streaked during the flood. Johnson denies that these expenses were reasonably incurred but provides no rationale

for its position.

### D. Thyssen Krupp elevator

Bloomingdale's paid Thyssen Krupp $108,880.59 for repairs to the elevators after the flood. However, the invoice contains some inaccuracies: the *stated* sum total of labor and material, plus tax for the material, is the amount above, but the *actual* sum total of those entries is $108,881.19. Whether stated or actual, the sum total lacks evidentiary support. Thyssen Krupp billed Bloomingdale's for $24,236.26 worth of materials, but the parties agree that the documentary support for billing reflects only $8,837.15 in materials plus taxes.[1] Moreover, one bill for $21.86 actually predates the flood. Therefore, only $8,815.29 in materials is supported by documentary evidence.

Likewise, Thyssen Krupp billed Bloomingdale's for 294 hours of labor totaling $82,887.80, but provided documentary evidence of only 241 hours (142.5 hours of regular time, plus 98.5 hours of double time). The parties disputed whether the hours recorded related to work from the flood. However, the court finds that the supported labor costs relate to the flood, and total $74,011.[2]

---

[1] While the parties claim that all of this total is for materials, one of the invoices makes plain that $20.82 is actually taxes.

[2] This total for labor is equal to 142.5 hours of regular time at $218.00 per hour, plus 98.5 of double time, at $436.00 per hour. The court finds no evidence supporting the differentiation on the invoice between certain regular time at $218.00 per hour and other regular time at $218.40 per hour.

3

### E. Office furniture

Bloomingdale's paid $792.31 to replace certain office furniture and equipment that was damaged by the flood. Curt Yearwood, expert for Bloomingdale's, calculated that after depreciation, $475.39 was the proper replacement value for the furniture, which was one year old prior to the flood.

### F. Engle Martin Adjustment Services

Engle Martin Adjustment Services provided insurance claim adjustment services after the flood, and ultimately charged Macy's $3,611.13 for its services. Engle Martin's invoices indicate it inspected the store, met with Daniel Ihra of Bloomingdale's to discuss loss details, and composed various memoranda regarding the adjustment of claims.

### G. M.J. Clark, Inc.

M.J. Clark, Inc. is the general contractor that (along with its subcontractors) performed cleanup and repair services after the flood. M.J. Clark initially invoiced Bloomingdale's for $168,583.16 in labor. Bloomingdale's negotiated a payment of $150,000, which it now seeks as damages. Johnson disputes these damages, but does not specify the basis for its dispute.

### H. Employees' labor

Bloomingdale's seeks $29,508.00 in labor costs that it asserts were incurred in response to the flood and breaks down those costs as follows. First, it paid wages of employees who showed up at the store but who could not perform their normal duties due to the flood, but whom Bloomingdale's had to pay anyway pursuant to store policy. Second, Bloomingdale's paid wages of employees who showed up to the store and, in

addition to performing their normal duties, participated in the cleanup of the store. Third, Bloomingdale's paid wages to employees from its Medinah store who had to come to the store to help perform cleanup. On cross-examination, Mr. Yearwood and Mr. Ihra both acknowledged that the store's labor costs were not any greater than those that Bloomingdale's would have incurred had the flood not occurred.

### I.    Wrapping and sending damaged merchandise

Bloomingdale's claims that it spent $596.60 on packaging damaged merchandise for transport off site. However, the expenditure lacks support in documentary evidence, and Bloomingdale's presented no evidence by any witness with personal knowledge that this expense was actually paid. Finally, a letter from the salvage company that received the merchandise indicates that the eventual buyer of the damaged merchandise paid for the cost of removing the damage merchandise.

### J.    Destroyed merchandise

Bloomingdale's claims $77,190.56 in damages resulting from merchandise it claims was destroyed during the flood. Bloomingdale's arrived at this total by determining the cost value of the destroyed merchandise, which was $103.587.95, then subtracting the proceeds of its post-flood salvage effort, which were $26,637.39. Johnson claims that "cost value" does not reflect fair market value, because Bloomingdale's would have had to sell much of its merchandise below cost even if the flood had not occurred. Johnson bases this claim on an exhibit detailing the cost value and retail value of each of the destroyed items. But this exhibit also shows that Bloomingdale's, like most retail enterprises, likely would have sold much of its merchandise above cost. Therefore, the court finds that Bloomingdale's claim of

$77,190.56 for destroyed merchandise was reasonably accurate.

### K.    Business income loss

Bloomingdale's also claims business income losses of $58,356.94 resulting from its inability to open on March 11, 2003.  Bloomingdale's reached this figure based on the calculations of Brad Boyle, who was the Operating Vice President of Risk Management for Bloomingdale's and was extensively involved in post-flood efforts on its behalf.

Johnson responded that Boyle was not qualified as an expert to testify as to business losses, and was not sufficiently knowledgeable of the underlying facts to offer his opinion as a lay witness.  This objection is discussed in greater detail and resolved in section II.A within.

Bloomingdale's did not provide other evidence of business income loss.[3]

---

[3]

Bloomingdale's cites Mr. Yearwood's testimony regarding Mr. Boyle's calculation.  However, the court finds that Mr. Yearwood's testimony is unclear, and, even given the charitable interpretation urged by Bloomingdale's, does not constitute further evidence of business losses suffered by Bloomingdale's.

### L.     Excess energy utilization

Bloomingdale's seeks compensatory damages of $470.59 for excess energy usage by power generators and other machinery in conducting cleanup and repair operations after the flood.   Bloomingdale's supports its claims by a calculation of its energy usage over the span of the cleanup less the normal energy usage during a regular, similar period.   Johnson admits that this expense was incurred in connection with those operations.

### M.     Travel expenses

Bloomingdale's has claimed $5,947.32 in travel expenses, and supports these claims with voluminous records.   Several expenses, totaling $1,133.25, were plainly related to Osvaldo Velez's trip to Chicago after the flood to help with the post-flood cleanup.  These expenses include: Mr. Velez's ticket from Atlanta to Chicago[4] on March 11, 2003, $117.00; his Delta Air Lines charge on March 13, 2003, $539.00; his Westin Hotels charge from Chicago on March 14, 2003, $330.92; two taxi receipts for Mr. Velez's trips to and from Chicago O'Hare International Airport, totaling $69.00; and his Carson's Ribs charge from Chicago on March 12, 2003, $77.33.   Bloomingdale's also purchased nearly $1,800 in clothing for Mr. Velez because he was unexpectedly re-routed to Chicago.   However, there is no evidence of whether Mr. Velez retained possession of that clothing and, if so, what the value of the clothing was to him or, if not, what value Bloomingdale's obtained from the sale of the clothing.   Moreover, the records suggest that Mr. Velez was in (the admittedly cold) Chicago for three days, and such an expenditure for a few days' clothes is either unreasonable, not indicative of the fair

---

[4]

     Mr. Velez was already scheduled to travel from Miami to Atlanta when he learned of the flood.  At that point, he traveled from Atlanta to Chicago.

market value of the clothing, or both.  Finally, Bloomingdale's submitted evidence of other travel-related expenses from late 2003 into 2004.

### N.    INC fixture

Bloomingdale's also seeks $1,952.86 in damages for the cost of a merchandise display fixture, which the parties call the INC fixture and which was warped and damaged by the flood.  Bloomingdale's received a quote of $2,297.48 to replace the INC fixture, but did not actually replace it.  It is unclear how old the replaced INC fixture was, and what state it was in before the flood.  Nevertheless, Mr. Yearwood took this quoted value and deducted fifteen percent for depreciation (assuming that the fixture was one to two years old), arriving at a value of $1,952.86.

### O.    Fax machine

Bloomingdale's seeks $480.00 as the depreciated value of a fax machine that it purchased to replace a previous machine damaged by the flood.  Johnson admits that the new machine cost $800.00, but denies that Mr. Yearwood's calculation of the depreciated value of the old fax machine based on the purchase price of the new machine is adequate.

### P.    Fifth floor offices

Bloomingdale's seeks recovery of $10,450 for the estimated cost to repair part of the fifth-floor wall and ceiling that sustained flood damage.  Bloomingdale's presented evidence of these estimates and of the actual replacement of the walls and ceiling. Johnson does not dispute that the estimated repair cost was as stated above, or that the wall and ceiling sustained water damage.

### Q.    Cash wrap stands

Bloomingdale's seeks recovery of $33,600 in damages for the replacement of two

"cash wrap stands"–a term of art for the structure surrounding the cash register. Bloomingdale's presented evidence that the stands were damaged during the flood, when water separated the laminate that covered the stands from the wood underneath. The cost of replacing each stand was $24,000; Bloomingdale's arrived at its damages calculation based on Mr. Yearwood's thirty percent depreciation of the stands. Johnson presented evidence that the stands were not damaged at all, and particularly that the laminate was not separated from the wood underneath. Moreover, there is evidence that the cash wrap stands were still in use in April 2005, over two years after the flood, and there is no evidence that the cash stands actually were replaced.

### R.  Fourth floor painted shelving

Bloomingdale's claims, and Johnson does not dispute, that certain shelving related to DKNY-brand merchandise was ruined by the flood, and was eventually removed; the estimated cost to repair that shelving was $1,600.

### S.  Third floor carpeting and hardwood flooring

Bloomingdale's seeks $143,914.00 in damages for labor and materials costs related to initial repairs made on the third floor after the flood. According to Bloomingdale's, the hardwood floor on the third floor buckled and had to be replaced so that the store could re-open in a timely fashion. To make this replacement quickly, Bloomingdale's used carpeting that it kept in storage, cutting the carpeting into patches to fit as needed. However, Bloomingdale's does not claim as damages the cost of this patchwork carpeting or its installation. Rather, Bloomingdale's seeks compensation for costs it incurred in August 2003, when it replaced the patchwork carpet and sections of the remaining hardwood floor, some of which had begun to buckle, with new carpeting.

Problematically, the re-carpeting included areas undamaged by the flood. Bloomingdale's was invoiced $99,400 by M.J. Clark for labor associated with the installation of the new carpeting, and $44,514 for the carpeting itself.

Johnson objects that the damages claimed are not the real damages incurred, as described above. Johnson further argues that Bloomingdale's had already scheduled, pre-flood, to re-carpet much of the third floor, and so the costs of installing the new carpet were not really damages resulting from the flood. Bloomingdale's responds that it had to use different carpeting than it had planned before the flood to install on the third floor, since the already-ordered carpet would not fit the damaged areas.

Bloomingdale's presented no evidence of the cost of the patchwork carpeting, opting to claim the cost incurred in August 2003. Bloomingdale's likewise presented no evidence of additional costs in the August 2003 carpet installation specifically incurred because of the flood; undoubtedly some of the labor costs would have been incurred as part of the carpet-replacement project that had already been planned before the flood. Bloomingdale's also presented no evidence of the value of the replaced hardwood floors immediately before the flood, or of the patchwork carpet that was replaced.

In addition to claiming damages arising from the installation of carpeting on the third floor, Bloomingdale's seeks damages for the replacement of that carpeting with hardwood flooring. In short, Bloomingdale's replaced certain portions of hardwood floors with the patchwork carpet, as described above; replaced the patchwork and other carpeting with new carpeting in August 2003, for which it now seeks damages; and moreover seeks compensation for its prospective installation of new hardwood flooring to replace the previous carpeting.

**T.     Additional carpeting**

Finally, Bloomingdale's seeks $288,526.27 in damages for replacement of carpeting on the fourth floor and a small section of the third floor not discussed in section I.S above. Bloomingdale's presented evidence that, because of the flood, carpeting was stained and otherwise damaged, and that it has received a quote of $302,628.00 for the replacement of the carpet. Bloomingdale's then discounted this amount, recognizing that the pre-flood carpeting was not new.

## II. CONCLUSIONS OF LAW

**A.     Brad Boyle's calculations of business income losses**

Johnson seeks to bar Brad Boyle's calculations of business income losses on the grounds that Mr. Boyle is unqualified to offer such a calculation. Johnson first argues that Mr. Boyle is not an expert and so cannot offer expert testimony pursuant to Federal Rule of Evidence 702. Bloomingdale's offers no evidence or argument regarding Mr. Boyle's expert qualifications in response. The court finds no basis for concluding that Mr. Boyle is an expert.

Johnson also argues that Mr. Boyle cannot offer lay opinion testimony regarding lost profits because he does not have sufficient personal knowledge of the matters on which he opines. Bloomingdale's disagrees, arguing that, although Mr. Boyle is not employed in the store, or even in Chicago, he occupies the type of role within the Bloomingdale's corporate structure that enables him to opine as to lost profits. Johnson responds that Mr. Boyle's employment within a large corporation does not exempt him from the requirement of personal knowledge in offering lay opinion testimony.

"In the realm of lost profits, lay opinion testimony is allowed in limited

circumstances where the witness bases his opinion on particularized knowledge he possesses due to his position within the company." *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862 (7th Cir. 2009) (citing Fed. R. Evid. 701 advisory comm. nn.). In *Von der Ruhr*, the Seventh Circuit found that a corporation's president was not entitled to offer lay opinion on a variety of matters. *Id.* at 863-64. Specifically, the Seventh Circuit found that the president could not offer his lay opinion where the basis of his opinion was only "a series of materials that [he] read." *Id.* at 864. The court specifically distinguished cases in which witnesses had "knowledge and participation in the day-to-day affairs of his business" about which witnesses opined. *Id.* (citation and quotation marks omitted). In those cases, witnesses' opinions are valid because they are based on their unique and personalized knowledge.

Here, Mr. Boyle has prepared lost profits calculations in several instances for Bloomingdale's. In this case, he prepared such a calculation for lost profits from the week of the flood based on the previous week's trends and "the plan" that Bloomingdale's set for the store for the four days in which the flood caused the closure of all or part of the store, and compared these numbers to the amount that Bloomingdale's actually earned during those four days. Although Mr. Boyle did not have personal, first-hand knowledge of the trends and projections he used to calculate lost profits, his position within Bloomingdale's likely gave him the sort of "particularized knowledge" that was both greater than the corporate president in *Von der Ruhr* and sufficient to offer a lay opinion. *See Cent. States, Se. & Sw. Areas Pension Fund v. Transp. Serv. Co.*, 2009 WL 424145, at *5 (N.D. Ill. Feb. 17, 2009) (collecting cases in which lay opinion testimony from senior employees allowed).

12

However, the court need not resolve the issue of Mr. Boyle's qualifications, because his method of calculating lost profits disqualified him from offering lay opinion testimony. Mr. Boyle could not explain the nature of "the plan" on which he in part based his calculations. The definition of the data comprising "the plan" is important. As the Seventh Circuit has explained, calculated lost profits derived from projections or goals are not based on raw data, but rather on inferences drawn from raw data. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005). These inferences, by removing the lost profits calculations from the raw data, render the opinion less helpful to the determination of lost profits. *See id.*; *see also* Fed. R. Evid. 701. Moreover, internally derived goals, which "the plan" may be, are frequently optimistic and therefore unreliable as a basis for the calculation of actual lost profits. *See id.* at 420. In sum, Bloomingdale's has failed to satisfy its burden of showing that Mr. Boyle's opinion regarding lost profits evidence is admissible.

**B.       Damages under Illinois law**

Under Illinois law, the plaintiff has the burden of proving by a preponderance of the evidence both that it suffered damages and "a reasonable basis for computation of those damages." *Perfection Corp. v. Lochinvar Corp.*, 812 N.E.2d 465, 470-71 (Ill. App. Ct. 2004); *see also Gill v. Foster*, 626 N.E.2d 190, 194 (Ill. 1993). Where the plaintiff establishes that it suffered damages, but does not provide a reasonable basis for the computation thereof, "only nominal damages are recoverable." *In re Estate of Halas*, 568 N.E.2d 170, 184 (Ill. App. Ct. 1991) (citation omitted).

Bloomingdale's seeks recovery for damage to property caused by the flood. A plaintiff that satisfies its burden of proof in a property damage case is entitled to compensatory damages–that is, those damages that make the plaintiff whole and restore it to the position it was in before the injury. *See Harris v. Peters*, 653 N.E.2d 1274, 1275 (Ill. App. Ct. 1995). In cases of property damage, compensatory damages are measured as follows. When the property is damaged beyond repair, plaintiff can recover compensatory damages equal to the fair market value of the property immediately before its destruction, less any salvage value that the property may have. *Id.* (citation omitted); *Winfield Design Assocs., Inc. v. Quincy Jefferson Venture*, 581 F. Supp. 21 (N.D. Ill. 1984) (applying Illinois law). When damaged property is repaired, compensatory damages are equal to the cost of the repairs necessary to restore the property to its physical condition before the damage. *See In re Chi. Flood Litig.*, 1995 WL 437501, at *3 (N.D. Ill. July 21, 1995); *see also Williams-Bowman Rubber Co. v. Indus. Maint., Welding & Machining Co.*, 677 F. Supp. 539, 546-47 (N.D. Ill. 1987). The cost of repairs may be shown by bills paid for such repairs, or even by the estimate of cost of

14

repairs by a person qualified to offer such an estimate, although such estimates carry less force. *See Lucas v. Bowman Dairy Co.*, 200 N.E.2d 374, 376 (Ill. App. Ct. 1964); *see also Marth v. Ill. Weather-Seal, Inc.*, 365 N.E.2d 588, 591 (Ill. App. Ct. 1977).

Showing the cost of the fair market value of property destroyed is more complicated. Bloomingdale's quotes the following instructive authority:

> Illinois courts have also recognized, within the context of tort actions, that the value of destroyed personal property is measured according to its fair market value before destruction. The absence of an established fair market value, however, does not necessarily preclude an action for loss of personal property. Damages may be ascertained based on replacement cost, value to plaintiff, or by other rational means and from such elements as are obtainable.

*Rajkovich v. Alfred Mossner Co.*, 557 N.E.2d 496, 499 (Ill. App. Ct. 1990) (citations omitted).

Based on the parties' briefing, two points of clarification are necessary. First, as counseled by the facts of the case cited, the adjective "established" as applied to fair market value means established by the market, not established for the purposes of the action by the parties' submissions in evidence. In *Rajkovich*, the personal property at issue was a drawing intended for an exhibition, an item without a market. *Id.* at 449. Therefore, the plaintiff could adduce the property's value by other means. *Id.*; *see also Long v. Arthur Rubloff & Co.*, 327 N.E.2d 346, 355 (Ill. App. Ct. 1975) ("Certain property–property which is not an ordinary object of commerce or is otherwise unique–is, of course, non susceptible to the general [market value] measure of damages."). Second, the court will consider the secondary means for proving property's value only where no market has established a value for the property damaged. Any other interpretation would allow the plaintiff to pluck the highest value from several methods

of determining the property's value, thus undermining the goal of compensatory damages.

Finally, while the plaintiff is generally entitled to recover compensatory damages for which it provides a reasonable basis of calculation, that entitlement comes with the duty to take reasonable steps to mitigate its damages. *See Toledo Peoria & W. Ry. v. Metro Waste Sys.*, 59 F.3d 637, 640 (7th Cir. 1995).

### C.     Bloomingdale's' damages

#### 1.     Stipulated damages

As described in section I.A above, the court finds that Bloomingdale's is entitled to $155,440.70 based on the parties' stipulations of certain damages.

#### 2.     Unopposed damages

Bloomingdale's is entitled to additional damages that it supported by evidence of bills paid or invoices (hence, the cost of repairs as described above) and that Johnson either did not oppose or simply denied without meaningful counter-argument.  These damages include $825.00 for cleanup of the glass enclosures surrounding the escalators; $150,000.00 to M.J. Clark for labor related to general cleanup; $470.59 for excess energy usage; $10,450.00 for the damages to the fifth floor offices; and $1,600.00 for painted shelving on the fourth floor.[5]  Thus, the court finds that Bloomingdale's is entitled to an additional $163,345.59 in damages.

#### 3.     Further damages

##### a.     *Grainger vacuums*

Bloomingdale's' claim of $2,501.06 in damages resulting from its purchase of wet vacs is largely unsupported.  The expenditure itself was warranted, but Bloomingdale's provided no evidence of the value of its use of several wet vacs, or of the salvage value of those wet vacs that expired during the cleanup.  Bloomingdale's has cited no authority supporting the rule that a damaged party can continue to enjoy appliances that it did not previously own while recovering damages for the purchase of those appliances.  The court declines to apply such a rule here, as the award of damages

---

[5]     Johnson also does not oppose certain travel expenses, which the court addresses more fully in its discussion of all travel expenses, contested and uncontested, in section II.C.3.i. within.

based solely on the purchase price of the wet vacs would put Bloomingdale's in a better position than it was prior to the flood. Bloomingdale's was clearly able to obtain value for some property post-flood, such as the destroyed merchandise that it salvaged; there is no indication that it could not have done the same with the various wet vacs which it purchased. Had Bloomingdale's done so, it might have been able to provide the court with a reasonable basis for the calculation of damages. Keeping in mind that the burden of proof belongs to Bloomingdale's, the court finds that the award of nominal damages of $1 is appropriate for the purchase of the wet vacs.

### b. *Thyssen Krupp elevator*

While Bloomingdale's paid Thyssen Krupp $108,880.59, it paid more than the underlying bills supported, as described in section I.D. above. The court finds that Bloomingdale's has carried its burden with respect to certain portions of its claimed labor expenses with respect to Thyssen Krupp, and awards Bloomingdale's damages of $74,011 for labor. The court also finds that Bloomingdale's is entitled to $8,815.29 in damages for materials. The bills for materials are presumably for new materials, but there is no indication that the repairs in question prolonged the life of the repaired elevators. Therefore, the materials are more properly calculated as damages at the full amount billed. *See In re Chi. Flood Litig.*, 1995 WL 437501, at *3 (noting that depreciation not taken from repairs where the parts do not prolong life of the repaired property). The court therefore awards Bloomingdale's $82,826.29 related to the Thyssen Krupp's elevator repairs.

### c. *Office furniture*

Bloomingdale's paid $792.31 to replace office furniture destroyed by the flood.

As with other replaced property, Bloomingdale's is entitled to recover the pre-flood fair market value of the replaced furniture. Bloomingdale's presented evidence that the furniture replaced was approximately one year old, but presented no evidence of the fair market value of the furniture replaced. Rather, it claims damages of $475.39, which is a forty percent depreciation of the cost of the replacement furniture. But, as explained above, this is an improper measure of the value of the furniture replaced. Therefore, the court finds that Bloomingdale's incurred damages from the flood in the destruction of this furniture, but also finds that Bloomingdale's has failed to establish a reasonable basis for the calculation of damages, and therefore awards Bloomingdale's $1 in nominal damages.

### d.  *Engle Martin Adjustment Services*

As described above, Engle Martin Adjustment Services charged $3,611.13 for its adjustment services, which Bloomingdale's now claims as damages incurred in mitigating its damages from the flood. Engle Martin did not provide any cleanup or repair services after the flood, but did provide various adjustment services that Bloomingdale's would not have incurred had the flood not occurred. While Bloomingdale's did not provide specific detail on the nature or efficacy of Engle Martin's services, the invoices provide a reasonable basis for the calculation of damages. Bloomingdale's is entitled to $3,611.13 in damages claimed for its payment of Engle Martin adjustment services.

### e.  *Employees' labor*

Bloomingdale's seeks $29,508.00 in labor costs that it asserts were incurred in response to the flood, despite the fact that two of its witnesses acknowledged that

Bloomingdale's would have incurred these labor costs regardless of the flood. As described in section I.I above, Bloomingdale's seeks damages for wages paid to its employees who either could not perform their normal duties due to the flood and so were sent home, or had to perform other, cleanup-related duties in addition to or in lieu of their normal duties. As witnesses for Bloomingdale's attested, however, Bloomingdale's would have had to pay these employees anyway–they were the daily employees for the store. An award of these costs would be fundamentally inconsistent with the goal of compensatory damages, which is to put the injured party in the same position it would be in without the injury-causing conduct.

Moreover, Bloomingdale's seeks damages for its labor costs while simultaneously seeking damages for business income loss. These two recoveries are inconsistent. If Bloomingdale's maintains that it deserves as compensation what it otherwise would have earned, it must also accept the expenses it would have otherwise incurred, including its labor costs, as non-compensable.

Finally, there is some evidence that Bloomingdale's paid some employees overtime that it would not otherwise have paid. However, Bloomingdale's has not segregated the cost of these overtime hours, leaving no reasonable basis for the calculation of these damages.

Bloomingdale's has failed to carry its burden in establishing that it incurred labor charges as a result of the flood, except regarding overtime wages. With respect to overtime wages, Bloomingdale's has failed to establish its damages with reasonable certainty. Therefore, the court awards $1 in nominal damages for extra labor costs incurred by Bloomingdale's.

### f. Wrapping and sending damaged merchandise

Bloomingdale's seeks damages of $596.60 that it claims it spent on packaging damaged merchandise for transport off site, but failed to present convincing evidence that it actually paid this amount. By contrast, a letter from the salvager indicates unequivocally that the salvager's buyer paid this expense. The court finds that Bloomingdale's has failed to carry its burden in establishing that it incurred these damages.

### g. Destroyed merchandise

Bloomingdale's properly calculated the fair market value of its destroyed merchandise as $103.587.95, then deducted the $26,637.39 that it received as proceeds from the post-flood salvage effort. While Johnson objects to the valuation of certain items, the court finds that the cost of the merchandise provides a reasonable basis for the calculation of its fair market value. Bloomingdale's is entitled to that fair market value, less any proceeds from its obligatory mitigation. Therefore, the court finds that Bloomingdale's is entitled to $77,190.56 in damages resulting from destroyed merchandise.

### h. Business income loss

As explained above, the court finds that Brad Boyle's lay opinion regarding the business loss suffered by Bloomingdale's is inadmissible. Bloomingdale's presented no other evidence in support of its calculations. Mr. Ihra, who has personal knowledge of the store and its operations, witnessed the closure of the store on the day of the flood, and a decline in sales in the succeeding days. But Mr. Ihra did not make any calculations regarding business income loss. The court finds that while Bloomingdale's has

established that it suffered some business income losses, it has failed to carry its burden with respect to the amount of business income losses. Therefore, the court awards Bloomingdale's $1 in damages arising from business income losses.

<em>i.      Travel expenses</em>

As explained in greater detail in section I.M above, the court finds that Bloomingdale's is entitled to $1,133.25 in damages arising from Mr. Velez's March 2003 trip to Chicago to supervise cleanup efforts at the store. Bloomingdale's also reasonably incurred clothing expenses on Mr. Velez's behalf when he was unexpectedly re-rerouted from Atlanta to Chicago. However, Bloomingdale's did not have carte blanche to incur clothing expenses, and $1,800 was extravagant. Nevertheless, the amount spent provides a reasonable basis for the calculation of damages. Discounting the amount spent to a more reasonable expense, Bloomingdale's is entitled to $1,000 in damages for its purchase of clothing on behalf of Mr. Velez.

Another category of travel-related costs claimed by Bloomingdale's stems from earlier in Mr. Velez's travels. As mentioned above, Bloomingdale's paid for Mr. Velez to travel from Miami to Atlanta before paying for him to be re-routed to Chicago because of the flood. Yet, Bloomingdale's would have incurred the Miami-to-Atlanta expenses anyway, and cannot recover these expenses just because they coincided with the flood. *See Chi. Title & Trust Co. v. Walsh*, 340 N.E.2d 106, 116 (Ill. App. Ct. 1975).

Finally, the remaining expenses are too remote in time or in purpose to have arisen from the flood, and, in any case, Bloomingdale's has failed to show how each of these expenses is related to the flood. Therefore, the court finds that Bloomingdale's is entitled to a total of $2,133.25 in travel expenses.

22

*j.      INC fixture*

The court finds that Mr. Yearwood's calculation of the value of the INC fixture is not credible.  There is scant, vague evidence of the INC fixture's age before the flood, rendering any determination of the pre-flood fair market value of the INC fixture less reliable, as depreciation cannot be accurately determined.  While Bloomingdale's is entitled to damages arising from damage to the INC fixture, it has not carried its burden in establishing a reasonable basis for the calculation of damages.  Therefore, the court awards $1 in nominal damages for the INC fixture.

*k.      Cash wrap stands*

Bloomingdale's presented evidence that these stands were custom-made pieces.  Bloomingdale's, as it recognizes, is not entitled to the value of two new cash wrap stands, but rather is entitled to damages equal to the pre-flood value of the cash wrap stands, less any value it has received from the cash wrap stands since the flood.  The cash wrap stands therefore would likely not have a readily ascertainable fair market value, and in turn could be valued by reference to other measures, such as replacement cost, which Bloomingdale's has proven.  However, Bloomingdale's produced no evidence of the pre-flood condition of the cash wrap stands, which would be relevant to their replacement cost.  Moreover, Bloomingdale's continued to use the cash wrap stands for several years after the flood.  Finally, there is substantial evidence, consistent with Bloomingdale's continued use of the cash wrap stands, that any flood damage to the cash wrap stands was minor and susceptible to repair (as opposed to replacement).  Accordingly, Mr. Yearwood's calculation that Bloomingdale's is entitled to the cost of seventy percent of two new cash wrap stands does not provide a reasonable basis for the calculation of

damages. Therefore, the court awards Blomingdale's $1 in nominal damages.

*l.*      *Third-floor carpeting and hardwood flooring*

Bloomingdale's asserts that it deserves damages for the installation of new carpeting in August 2003 and for the installation of new hardwood floors, unscheduled as of the completion of briefing, to replace the carpeting and other portions of hardwood floors installed in August 2003. In other words, after receiving more than six years' worth of service from the carpet installed in August 2003, Bloomingdale's asserts that it now deserves to be returned to the pre-flood *status quo*. As an alternative, Bloomingdale's offers the choice of either the cost of installing the carpet or the cost of installing new hardwood floors. Notably, Bloomingdale's does not assert that it deserves damages for the installation of the patchwork carpeting as a temporary measure directly after the flood.

The post-flood installation of patchwork carpeting and some of the installation of new carpeting in August 2003 were related to the flood, and constitute the basis for recoverable damages. An injured party's reasonable, unsuccessful repairs can be recovered as damages, as the party incurs such expenses in furtherance of its duty to mitigate. *See Toledo Peoria & W. Ry.*, 59 F.3d at 640. Therefore, although the installation of patchwork carpeting proved unsuccessful, Bloomingdale's may still recover damages arising from that installation, provided Bloomingdale's satisfies its burden to provide a reasonable basis for calculating such damages. However, Bloomingdale's has provided no basis for calculating damages related to the installation of the patchwork carpeting, and the court thus awards Bloomingdale's $1 in nominal damages in connection with that installation.

The court also finds that Bloomingdale's is entitled to damages from the August 2003 re-carpeting. The Seventh Circuit has made clear that later expenses incurred may be recoverable as damages where the initial, reasonable attempts at repair or replacement prove unsuccessful. *Id.* at 641. However, the August 2003 re-carpeting included sections of the third floor undamaged by the flood; the re-carpeting of these sections does not form the basis for damages, as it is unrelated to the flood. The August 2003 re-carpeting also included areas that were scheduled to be re-carpeted anyway; labor costs related to these areas lack the requisite causal link to form the basis for damages. *Walsh*, 340 N.E.2d at 116. Therefore, the estimates for the cost of labor and materials overstate the cost of replacing the areas damaged by the flood, and do not provide a reasonable basis for the calculation of damages. Moreover, Bloomingdale's produced no evidence of the pre-flood fair market value (or even replacement value) of the hardwood floor that was replaced. Rather, Bloomingdale's has relied on the depreciated value of bills and estimates it has received for the entire August 2003 re-carpeting, and has failed to provide a reasonable basis for calculation of its damages. The court therefore awards Bloomingdale's $1 in nominal damages in connection with the August 2003 re-carpeting.

Finally, the court finds that the yet-to-be-scheduled installation of hardwood flooring is insufficiently connected to the flood to support the award of compensatory damages. While Bloomingdale's was entitled to make a second round of repairs after its initial, stop-gap attempt to mitigate damages proved unsuccessful, the August 2003 re-carpeting was not itself an attempt at mitigation, such that the proposed installation of hardwood floors on the third floor is not the proper basis for damages.

*Additional carpeting*

Finally, Bloomingdale's seeks $288,526.27 in damages for replacement of carpeting on the fourth floor and a small section of the third floor not discussed in section I.S above. Bloomingdale's had not changed the carpeting as of the time of trial, over five years after the flood. Moreover, Bloomingdale's presented evidence of the cost of new carpeting, which it then discounted, rather than presenting evidence of the cost of carpeting before the flood and the value of the carpeting after the flood. The carpet clearly had some value after the flood, as evidenced by Bloomingdale's use of the carpet for at least five years. The court finds that Bloomingdale's suffered some amount of damages related to the flood, but also finds that Bloomingdale's has failed to adduce evidence of the fair market value of that carpeting, let alone the depreciated value of that carpeting directly before the flood.

Of course, the replacement of carpet entails both the cost of the carpet and the cost of labor, and the cost of labor is not subject to the same fair market value analysis as the cost of carpet. But Bloomingdale's must still prove the cost of labor. The bills on which bases its claim for these carpeting-related damages do not differentiate between costs of labor and costs for materials. Accordingly, Bloomingdale's has also failed to establish a reasonable basis for calculating the value of the labor necessary to replace the damaged carpet.

Therefore, the court awards Bloomingdale's $1 in nominal damages related to these carpeting costs.

### III. CONCLUSION

Based on the above, the court awards Bloomingdale's $484,556.52 in damages

for Johnson's negligence.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: November 12, 2009